UNITED STATES of America, Appellee,

v.

Jose F. BLASINI–LLUBERAS,
Defendant–Appellant.

No. 98–1392.

United States Court of Appeals,
First Circuit.

Heard Sept. 24, 1998.

Decided Jan. 25, 1999.

---

Roberto Boneta, for appellant.

Jorge E. Vega–Pacheco, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Nelson Pérez–Sosa and Thomas F. Klumper, Assistant United States Attorneys, were on brief for appellee.

Before BOUDIN, LYNCH, and LIPEZ Circuit Judges.

LIPEZ, Circuit Judge.

On April 5, 1995, a federal grand jury returned a multiple count indictment against defendant Jose Blasini–Lluberas ("Blasini"), a former executive vice president of Ponce Federal Bank,[1] and his co-defendant, Ramiro Colón–Muñoz ("Colón"), president of the bank. The indictment charged both defendants with five counts of misapplication of bank funds under 18 U.S.C. § 657, one count of bank fraud under 18 U.S.C. § 1344, one count of false entry under 18 U.S.C. § 1006, one count of benefitting, directly or indirectly, from the loan transactions in question under 18 U.S.C. § 1006 and one count of conspiracy under 18 U.S.C. § 371.[2] The jury returned guilty verdicts against Blasini on all but one count, acquitting him on the charge of benefitting from the loan transactions.[3] On appeal, Blasini challenges the sufficiency of the evidence to support the verdict, instructions to the jury, and several aspects of the sentence. For the reasons discussed below, we conclude that there was insufficient

evidence to support the jury verdict on four of the five counts of misapplication of bank funds and order an acquittal as to those counts. Finding no reversible error in the jury instructions, we affirm the remaining convictions and remand for re-sentencing.

## I.

From a review of the evidence in this case, the jury could have found the following. On July 15, 1987, co-defendant Ramiro Colón, president of Ponce Bank, and his wife purchased a farm from thirteen members of the Usera family who had inherited the farm from Julio Usera Santiago. The total purchase price for the farm, known as "La Esmeralda" and located in the municipality of Salinas, Puerto Rico, was $555,600. Colón paid $83,340 at the closing with the remaining balance due nine months later on April 14, 1988.[4] The agreement provided that no interest would be due on the outstanding balance. As security for the $472,260 balance, Colón granted the Usera family a mortgage on the property.

Following Colón's purchase of the farm, but prior to the due date of Colón's outstanding $472,260 obligation, four members of the Usera family approached Colón requesting money. Monserrate Usera and her sister Ana Usera were the first two, approaching Colón in August of 1987 for money to pay off personal debts: Monserrate Usera needed funds to pay student loans and her daughter's college tuition; Ana Usera needed funds to make repairs to a building. Although Monserrate Usera understood that Colón's obligation to the family was not due until the spring of 1988, she went to Colón for an advance. Colón said he would look into getting her the funds she needed. Monserrate

---

1. At all times relevant to the issues in this appeal, Ponce Federal Bank was insured by the Savings and Loan Insurance Corporation.

2. Each count, other than the conspiracy count, further charged that the defendants aided and abetted each other in furtherance of the crimes charged in violation of 18 U.S.C. § 2 (1998).

3. Blasini's codefendant, Ramiro Colón, was convicted of all these charges plus one additional count of making a false statement in a subse-

quent loan application. Colón's additional conviction related to a loan he obtained to pay off his outstanding debts to the Usera family. See part I. infra. As Blasini was not charged with a crime on the basis of any conduct relating to these subsequent transactions, we omit any detailed reference to them.

4. Each of the thirteen members of the family was owed a pro rata share of the purchase price according to each member's inheritance share.

Usera explained that when Colón agreed to help her, she understood that she would be taking out a loan from the bank, the obligation for which was hers alone. Ana Usera also decided to contact Colón in an effort to obtain money to pay off her current debts since it was taking such a long time to complete the sale of the farm. Ana Usera explained that, after Monserrate Usera made the initial contact with Colón, they both decided to "make a loan." Although Ana Usera understood that she and her sister had other options, she thought it best to take out a loan from the bank to satisfy her outstanding obligations.

Subsequent to these discussions, Colón sent the sisters to see Blasini, then an executive vice president of Ponce Federal Bank. Colón instructed Blasini to assist each of them in securing a loan from the bank, which he did. As vice-president of the bank, Blasini was authorized to approve unsecured loans up to $50,000 and secured loans up to $100,-000. When the sisters arrived, he authorized an $11,000 loan for each, subject to a rate of interest and a due date. Neither loan application included a financial statement or credit history. Monserrate Usera and Ana Usera signed the promissory notes and executed partial assignments of their mortgage interests in the farm as security for the loans. The partial assignments were signed by both Blasini and Colón but were not included in the loan file. The stated purpose for the loans was personal; the means of repayment was the sale of a farm. Because the loans did not exceed $50,000, their approval did not require collateral.

In January of 1988, Carmen Maduro Usera, the mother of Monserrate Usera and Ana Usera, received a loan from Ponce Federal Bank under similar circumstances. Although the loan documentation was introduced at trial, Carmen Maduro died before trial and her testimony was never taken. Ana Usera testified that she helped her mother make arrangements over the phone to obtain a $15,000 loan and then accompanied her mother to the bank. The documents themselves indicated that Blasini authorized the loan, that the purpose of the loan was personal and that it was needed to pay off an outstanding $5,000 loan to the

bank. The promissory note set a rate of interest and a due date for repayment. Although the application did not include a financial statement or credit history, it noted that Carmen Maduro was well known to the Colón family. Carmen Maduro also executed a partial assignment of her mortgage interest as security for the loan one day after the loan was disbursed to her, signed by Blasini and Colón, but it did not appear in the loan portfolio.

In March of 1988, Vicente Usera Tous received a $20,000 loan from the bank, authorized by Blasini. Vicente Usera also died prior to trial and never testified about the loan transaction. Although he was a member of the Usera family, he did not stand to inherit proceeds from the sale of the farm. Instead, he was due a commission of $23,613 for his assistance in brokering the sale of the farm. His loan application, admitted in evidence, was missing a financial statement and a credit history, but the application stated that he was well known to the bank, in particular to Colón, and that he was a responsible person. The stated means of repayment was the commission from the sale of a farm.

When Colón's debt to the Usera family came due on April 14, 1988, he was unable to meet his obligation. On April 19, 1988, another member of the Usera family, Consuelo Garcia–Gomez, went to the bank and demanded payment of her share of the purchase price. Consuelo Garcia–Gomez was entitled to $200,000, the largest share of the inheritance. Wendell Colón, Colón's brother, told Consuelo Garcia–Gomez that the money was not immediately available. She then asked for $100,000. Thereafter, Blasini brought Consuelo Garcia–Gomez to a loan officer and instructed the officer to disburse a $100,000 loan to her. The information in her loan application was provided to the loan officer by Blasini and the application stated that collateral for the loan was a partial assignment of Consuelo Garcia–Gomez's mortgage interest in the farm. The listed purpose of the loan was the purchase of an apartment. Directly above Blasini's signature, Blasini wrote, "discussed and agreed to

by attorney R.C. Colón."[5] At trial Consuelo Garcia–Gomez explained that, although she signed loan documents to receive the $100,-000, she did not go to the bank to obtain a loan and she never read the loan documents before signing the documents. She maintained that the $100,000 was partial payment of the money owed to her rather than a loan.

A few weeks later, in May, Colón wrote two sets of checks. The first set paid off the debts of Monserrate Usera, Ana Usera, Carmen Maduro, Vicente Usera and Consuelo Garcia–Gomez. He listed the appropriate amount of their outstanding debts and named both the bank and the borrower as joint payees. The second set paid each Usera the balance of what he or she was owed. Each member of the Usera family then signed a cancellation of the mortgage.

On December 19, 1996, a jury convicted Blasini of the charges described herein. On February 23, 1998, he was sentenced to thirteen months imprisonment to be followed by two years supervised release. He was fined $8,000. Blasini now appeals.

## II.

### A. Sufficiency of the Evidence

When there is a challenge to the sufficiency of the evidence to support a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307,

319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A conviction may rest, in whole or in part, on circumstantial evidence. *See United States v. Mena–Robles,* 4 F.3d 1026, 1031 (1st Cir. 1993). It is well established that "an appellate court plays a very circumscribed role in gauging the sufficiency of the evidentiary foundation upon which a criminal conviction rests." *United States v. Woodward,* 149 F.3d 46, 56 (1st Cir.1998). Nevertheless, we have cautioned that "[d]espite the deference that characterizes appellate review of jury verdicts, juries do not have carte blanche. The appellate function ... requires the reviewing court to take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *Id.* (quoting *United States v. Spinney,* 65 F.3d 231, 234 (1st Cir.1995)). We noted that "[t]his function is especially important in criminal cases, given the prosecution's obligation to prove every element ... beyond a reasonable doubt." *Id.* at 56–57 (quoting *Spinney,* 65 F.3d at 234). We must reverse a conviction "on the grounds of evidentiary insufficiency where an equal or nearly equal theory of guilt[ ] and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict." *Id.* at 57 (citing *United States v. Guerrero,* 114 F.3d 332, 344 (1st Cir.1997))(internal citations omitted).

### B. Misapplication[6]

Courts have struggled to give precise definition to the crime of misapplication,[7]

5. Although the bank officer used the initials "R.C. Colón" when offering the testimony at trial about Blasini's notation on the loan application, the correct reference would have been to "R.L. Colón," as set forth in the indictment. The officer made clear, however, that she was referring to the president of the bank, co-defendant Colón. Although the bank officer refers to Colón as an attorney, it is not otherwise clear from the record that Colón was in fact an attorney.

6. The alleged offenses of misapplication, bank fraud and false entry were committed in 1987 and 1988. Although each of the relevant statutes has been amended since then, the amendments do not bear directly on the issues on appeal. For the most part, changes to the statutes concerned punishment for—not elements of—the offense. We therefore refer throughout this opinion to the

statutes in their current form. Of course, for the purposes of sentencing on remand, the statutes as they appeared at the time of the offense control.

7. The statute provides in pertinent part:

Whoever, being an officer, agent or employee of or connected in any capacity with the Federal Deposit Insurance Corporation ... or savings and loan corporation or association authorized or acting under the laws of the United States ... embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution ... [is guilty of misapplication of bank funds].

18 U.S.C. § 657 (1998).

consistently noting that "[t]he problem that has confronted and perplexed the courts is that there is no statutory definition or common law heritage that gives content to the phrase 'willfully misapplies.' " *United States v. Wester*, 90 F.3d 592, 595 (1st Cir.1996).[8] These uncertain origins have posed a challenge to courts attempting to distinguish bad judgment from bad conduct that is illegal. Nevertheless, in *Wester*, we recently discussed the two notions that underlie the crime of misapplication: one relating to conduct, i.e., wrongful use of bank funds, the other focusing on an intent to injure or defraud a bank. The government cannot prove its claim of misapplication without establishing both elements. *See id.* The interrelationship between these elements is subtle, given that "the same facts can easily be the basis for deeming the conduct to be wrongful and the intent fraudulent." *Id.*

### Counts Two through Five

■ In this case, the government's theory was that Blasini was attempting to deceive the bank as to the true purposes of the loans: namely, that the disbursements to the Usera family were partial payments of Colón's debt. However, Colón's obligation to the Usera family did not come due until April 14, 1988. Blasini approved loans to Monserrate Usera and Ana Usera in August of 1987; to Carmen Maduro in January of 1988; and to Vicente Usera Tous in March of 1988. Because Colón had no current obligation to the Useras at the time these four loans were extended, the loans cannot be characterized as partial payments of a debt. Both Ana Usera and Monserrate Usera testified that they needed money and, since the balance on the farm would not come due for many months, they went to Colón to seek an advance of funds. Although the jury could

have concluded from this testimony that they were initially requesting an advance of the money Colón owed them, both sisters testified that they understood they were executing and signing loan documents. Ana Usera testified that, following her discussions with her sister and Colón, she decided to take out a loan from the bank. Monserrate Usera explained that she understood her obligation to the bank and she noted that, even if Colón had not paid the balance of his debt, she would have paid the balance of the loan. Although we have no direct testimony concerning Carmen Maduro's loan, her daughter Ana testified that her mother was also interested in obtaining a loan to satisfy some of her debts. The government's theory that Blasini was executing "sham" loans and intending to defraud the bank as to their true purpose is simply not supported by the evidence.

With regard to Vicente Usera, the government's theory of misapplication is even weaker. Colón had no outstanding obligation to Vicente Usera, who was simply owed a commission following the sale of the property. He was not entitled to a share of the profits. There was no debt that Colón had to pay at any time.

Nor are there "other circumstances" sufficient to convert these loans into misapplication of bank funds. *See United States v. Gens*, 493 F.2d 216, 222 (1st Cir.1974)(holding that "where the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot—absent other circumstances—properly be characterized as a sham or dummy"). The loan applications lacked financial statements and credit histories yet they comported with minimal requirements for legitimate

---

8. We note that both parties rely on cases construing willful misapplication under 18 U.S.C. § 656 and 18 U.S.C. § 657 interchangeably. The Fifth Circuit has noted that, textually, the two sections are virtually identical except that § 656 applies to banks and § 657 to savings and loan associations. *See United States v. Parks*, 68 F.3d 860, 864 (5th Cir.1995). Not surprisingly, many courts have relied on prior analysis of one section to support a conclusion as to the other section. *See United States v. Olano*, 62 F.3d 1180, 1200 (9th Cir.1995); *United States v. Mar-* *quardt*, 786 F.2d 771, 778 (7th Cir.1986). In the absence of legislative history to suggest that there is any substantive difference in meaning, we find the reasoning in cases construing § 656 equally applicable to our reasoning in the instant appeal. *See, e.g., Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932)(presumption that the same words used in different parts of an act have the same meaning); *Fortin v. Marshall*, 608 F.2d 525, 528 (1st Cir.1979)(same).

loans. The former Ponce Bank commercial credit officer testified that she could not think of any bank policy which would forbid the bank to disburse a loan without any financial statement. Similarly, she testified that the lack of a credit history did not mean that a loan could not be authorized. The stated purpose on the loans was accurate and Blasini was well within his authority to approve the loans. The four members of the Usera family signed promissory notes and partial assignments for the loans. Although the partial assignments of Colón's obligations to the Useras were not included in all of the loan applications, collateral was not required for these loans and thus the partial assignments were not prerequisites to their authorization. At trial the government suggested that the failure to include the partial assignments in the files was an attempt to withhold the fact that Colón's future obligation was the means of intended repayment for the parties. This omission, without more, is not enough to transform the transactions into willful misapplication of bank funds.

We do not mean to suggest that Colón and Blasini were not playing it close to the line. Blasini may have been helping Colón to curry favor with the Usera family so that they would be lenient with Colón in the event that Colón had trouble satisfying his obligations. This possibility, however, given the totality of the circumstances, does not rise to the level of willful misapplication.

### Count Six

■ The loan to Consuelo Garcia–Gomez stands in stark contrast to the other four loans. Colón's debt to the Usera family had matured and he was late with payment. Consuelo Garcia–Gomez went to the bank and demanded payment. She did not request a loan. At the bank she initially met with Colón's brother who informed her that the money was not available. She demanded that he pay her something and she suggested $100,000. Thereafter, Blasini took Consuelo Garcia–Gomez to meet with the loan officer and instructed the officer on the details of the loan application. On the actual application, Blasini included the notation, "discussed and agreed to by attorney R.C. Colón." Although there is some uncertainty in the evidence as to how Consuelo Garcia–Gomez was brought to Blasini's attention, the jury could have reasonably concluded, given Blasini's notation on the application, that Colón himself contacted Blasini and requested that Blasini facilitate a $100,000 loan from the bank to Consuelo Garcia–Gomez.

In cross-examination of Consuelo Garcia–Gomez, Blasini attempted to show that she knew she was taking out a loan from the bank. Consuelo Garcia–Gomez denied this knowledge, maintaining that she did not pay any attention to what she was signing, even though she signed and notarized all the pertinent documentation for a $100,000 loan. She was simply happy that she was getting at least half of what was owed to her. Moreover, there was evidence, discussed *infra*, from which the jury could conclude that Blasini misrepresented the purpose of the loan in the application (stating that the loan was for the purchase of an apartment). As a result of this deceptive conduct, Blasini caused the bank to part with its monies through a sham loan to pay a portion of Colón's delinquent debt. This wrongful use of bank money, carried out with an intent to deceive the bank about the true nature of the transaction, involved all of the essential elements of the crime of misapplication.

### C. Bank Fraud [9]

■ The Government charged Blasini with one count of bank fraud, the elements of which are well established: 1) the defendant must engage in a scheme or artifice to defraud, or must make false statements or misrepresentations to obtain money from 2) a financial institution and 3) must do so knowingly. *See United States v. Brandon,* 17

---

9. The statute provides in pertinent part:
 Whoever knowingly executes, or attempts to execute, a scheme or artifice—
 (1) to defraud a financial institution; or
 (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises ... [is guilty of bank fraud].
 18 U.S.C. § 1344 (1998).

F.3d 409, 424 (1st Cir.1994).[10] A scheme or artifice is defined to include "any plan, pattern or course of action, including false and fraudulent pretenses and misrepresentations *intended to deceive* others in order to obtain something of value." *Id.* (emphasis added)(quoting *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987)). The statute provides that each execution of a scheme to defraud will constitute a separate indictable offense. *See* 18 U.S.C. § 1344; *see also Brandon,* 17 F.3d at 422. We have explained that "each time an identifiable sum of money is obtained by a specific fraudulent transfer, there is likely to be a separate execution of a scheme to defraud." *Id.* The government need not prove actual loss as a result of the scheme, however. *See United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir. 1987)("The Government was not required to show that [the bank] incurred a loss in order to prove a scheme to defraud ....."); *see also Brandon,* 17 F.3d at 427. Nor must the government show that the defendant personally benefitted from the alleged scheme. *See Goldblatt,* 813 F.2d at 624.

■ In the indictment, the government charged Blasini with one count of bank fraud based on five separate loan transactions, each of which could have served as the basis for the fraud allegation. *See Brandon,* 17 F.3d at 422. Thus, the bank fraud conviction is unaffected by our finding that four of the loans were legitimate. With respect to the fifth transaction, the evidence was sufficient for the jury to conclude that Blasini's conduct satisfied the elements of bank fraud because he knowingly engaged in a scheme to obtain bank funds, deceitfully characterized as a loan, to satisfy $100,000 of Colón's outstanding obligation to Consuelo Garcia–Gomez. Proof of Blasini's intent to deceive, a necessary element of the misapplication charge, was also proof of his scheme to obtain money from the bank by false representation, a necessary element of the charge of bank fraud. Accordingly, the evidence establishing misapplication of bank funds on the fifth loan also supports a conviction on the charge of bank fraud.

D. False Entry [11]

We have not had an occasion to construe § 1006. Read literally, § 1006 provides that any employee of an insured bank who makes a false entry in any statement to such institution with the intent to defraud such institution is subject to federal penalty. *See* 18 U.S.C. § 1006. In interpreting this section, however, the Fifth Circuit has read a "materiality" [12] requirement into the provision: that is, the government must show that the defendant knowingly and willfully made or caused to be made a false entry concerning a *material fact* in any statement to the institution. *See United States v. Parks,* 68 F.3d 860, 865 (5th Cir.1995). *But Cf. United States v. Harvard,* 103 F.3d 412, 417–20 (5th Cir.1997)(finding that materiality is not an element of 18 U.S.C. § 1005, a nearly identical statute). In his argument, Blasini adopts the Fifth Circuit's approach and contends that materiality is an element of the crime. The government also reads § 1006 to include materiality as an element of the crime.

Despite the shared views of the parties that materiality is an element of the statute, we can find no other circuit court which has

---

**10.** We note that bank fraud and misapplication do not prohibit the same conduct; for example, bank fraud requires proof that the defendant executed a scheme or artifice to defraud while misapplication has no such requirement. Misapplication, on the other hand, requires the action of a bank officer while bank fraud does not. *See United States v. Wolfswinkel,* 44 F.3d 782, 784–85 (9th Cir.1995).

**11.** The statute provides in relevant part:

Whoever, being an officer, agent or employee of or connected in any capacity with the Federal Deposit Insurance Corporation ... or any lending, mortgage, insurance, credit or savings and loan corporation or association authorized or acting under the laws of the United States ... with intent to defraud any such institution ... or to deceive any officer, auditor, examiner or agent of any such institution ... makes any false entry in any book, report or statement of or to any such institution ... [is guilty of a crime].

18 U.S.C. § 1006 (1998).

**12.** Materiality is whether the statement has "a natural tendency to influence or [be] capable of influencing, the decision·of the decisionmaking body to which it is addressed." *United States v. Gaudin,* 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

directly addressed this question. Recently, in *United States v. Wells*, 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997), the Supreme Court indicated its intent to construe similar statutory definitions narrowly. There the Court concluded that materiality of the falsehood was not an element of knowingly making a false statement to a federally insured bank under 18 U.S.C. § 1014: "Nowhere does it further say that a material fact must be the subject of the false statement or so much as mention materiality.... Thus, under the first criterion in the interpretive hierarchy, a natural reading of the full text, materiality would not be an element of § 1014." *Wells*, 117 S.Ct. at 927 (internal citations omitted). The Court went on to conclude that the common law would not import a materiality requirement into the term "false statement" and that ultimately the "statutory history confirm[ed] the natural reading." *Id.* at 928.

In light of this recent pronouncement of the Supreme Court about a comparable statutory provision,[13] the absence of advocacy in this case on the inclusion of a materiality element in § 1006, and our own conclusion that the evidence was sufficient to allow the jury to conclude 1) that the entry in question was false and 2) that it was material, we assume without deciding that materiality is an element of the crime of false entry for the purposes of this appeal.

■ Marisel Marrero, an assistant manager of the bank at the time in question, testified that Blasini instructed her to prepare documentation for a loan to Consuelo Garcia–Gomez. She testified that Blasini provided her with the basic information for the application ·and instructed her that the purpose of Consuelo Garcia–Gomez's loan

was the purchase of an apartment. Given Consuelo Garcia–Gomez's testimony that she did not believe she was taking out a loan, and given her brother's testimony that she was not intending to purchase an apartment,[14] it was reasonable for the jury to conclude that the statement on the loan application about the purchase of an apartment was false and that Blasini knew it to be so.[15]

■ Materiality requires proof that the entry would have the capability or tendency to influence the bank in its decision-making process, or impair or pervert the functioning of the government institution. *See United States v. Parks*, 68 F.3d 860, 865 (5th Cir. 1995); *see also United States v. Corsino*, 812 F.2d 26, 30 (1st Cir.1987)(discussing the materiality requirement in 18 U.S.C. § 1001). "[T]he standard is not whether there was actual influence, but whether it would have a tendency to influence." *United States v. Edgar*, 82 F.3d 499, 510 (1st Cir.1996). Thus, the government is required to demonstrate the false entry's potential effect on the governmental agency, even if the false entry did not actually affect the government function. *See United States v. Swaim*, 757 F.2d 1530, 1534 (5th Cir.1985)( the government need not show actual reliance on the false statement, only that the statement itself would have impacted the bank).

Ironically, it was Blasini's own expert witness who offered the testimony from which the jury could reasonably have concluded that the false entry as to the purpose of the loan would have the tendency to influence the bank's decision or, alternatively, would affect a bank examiner's later review of the propriety of the loan. Michael Cinkala, a bank examiner with over twenty years experience,

---

13. For a discussion of whether "materiality" is an express or implied element in false statement/entry statutes, see Elizabeth G. Livingston, Comment, *Judicial Treatment of the Element of Materiality in Federal Criminal False Statement Statutes*, 72 Tul. L.Rev. 1343 (1998).

14. Although defense counsel insisted at oral argument that there was no such testimony, a careful reading of the trial transcript reveals that her brother did in fact testify that his sister did not intend to purchase an apartment.

15. At oral argument, defense counsel suggested that, since there was no direct evidence to establish that Blasini knew that the statement was false, and since it was possible that the information about the purchase of an apartment might have been given to him by an unexplained source, the jury could not convict on this count. There was no evidence, however, to support his theory of an unexplained source and, given the evidence available to the jury, we cannot say that it was unreasonable for the jury to infer from the evidence that Blasini knew the statement was false.

testified that *"the information you would be looking for in a loan file would be,* for instance, the financial statement of an individual or corporation, the collateral, the—any comments written as to the character of the individual, *the purpose of the loan,* [and] some ability to repay the loan." From this testimony, the jury could conclude that the stated purpose on the loan application would be the type of information relied upon by bank examiners in reviewing loans to determine whether the bank is adhering to proper procedures. Accordingly, we find that the jury was presented with sufficient evidence from which it could conclude that the entry on the loan application was false and material in violation of § 1006.

 Blasini further contends that the court's failure to define "materiality" in its instructions to the jury was reversible error. Blasini did not raise this objection to the instruction at trial and our review is for plain error. *See United States v. Santana–Rosa,* 132 F.3d 860, 863 (1st Cir.1998). "[E]rror rises to this level only when it is so 'shocking that [it] seriously affect[ed] the fundamental fairness and basic integrity of the proceedings conducted below.'" *United States v. Ortiz,* 23 F.3d 21, 25 (1st Cir.1994) (citation omitted). We "review the context of the charge as a whole to determine if it contains an error that threatens to undermine the fundamental fairness of the trial." *Santana–Rosa,* 132 F.3d at 863 (internal quotation marks omitted).

Again, assuming that materiality is an element of the crime, the court's failure to define "materiality" in its instructions to the jury on the charge of false entry does not constitute plain error. The issue of materiality was submitted to the jury, with instructions that the false entry must be material and that materiality was an essential element of the crime. Blasini did not offer an objec-

tion to the instruction at trial and makes no developed argument on appeal why failure to define material would constitute plain error. We conclude that "materiality" is not such a technical concept outside of the jurors' experience that failure to define it rises to the level of plain error. *Cf. United States v. Fulmer,* 108 F.3d 1486, 1495 (1st Cir.1997)(meaning of the word "intimidate" not outside a juror's understanding such that failure to define the word would be an error that threatened to undermine the fundamental fairness of the trial).[16]

E. Conspiracy [17]

 To convict Blasini on a charge of conspiracy, the government was required to establish that: a conspiracy existed; Blasini knew of and voluntarily participated in the conspiracy; and an overt act took place in furtherance of the conspiracy. *See United States v. Woodward,* 149 F.3d 46, 67 (1st Cir.1998). The agreement can be tacit rather than express. *See id.* Neither the agreement nor Blasini's participation in furtherance of the agreement need be proved by direct evidence. *See id.* at 68.

 We reject Blasini's contention that there was insufficient evidence to support the conspiracy conviction. As discussed above, there was sufficient evidence from which the jury could conclude that Blasini engaged in misapplication of bank funds, bank fraud and making a false entry on a loan application— the three substantive counts underlying the conspiracy count. There was direct evidence of Blasini's conspiracy with Colón to use bank funds to satisfy Colón's outstanding debt: Consuelo Garcia–Gomez's application includes a handwritten notation by Blasini stating that the loan was "discussed and agreed to by attorney R.C. Colon." Moreover, there was circumstantial evidence from

---

**16.** Blasini contends that *United States v. DiRico,* 78 F.3d 732 (1st Cir.1996), stands for the proposition that failure to define materiality requires a reversal of the conviction. *DiRico,* however, was concerned with the court's failure to charge and submit the very issue of materiality to the jury and in no way stands for the proposition that if the issue of materiality is submitted to the jury, it must also be defined. *See id.* at 736.

**17.** A person is guilty of conspiracy,

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy....

18 U.S.C. § 371 (1998).

which the jury could infer that Blasini agreed to assist Colón in satisfying his debt to Consuelo Garcia–Gomez with bank funds, and that he knowingly participated in the execution of the plan to use bank funds for this purpose.

Finally, Blasini contends that the use of a general verdict form invalidates his conviction on the conspiracy count because the jury acquitted him on Count Nine, one of the overt acts charged in furtherance of the conspiracy. He claims that "the use of a general verdict form does not reveal which objects or overt acts the jury relied on to find Appellant guilty of conspiracy." This argument is against the force of the law and was rejected in *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371, (1991), where the Supreme Court stated: "When a jury returns a verdict on an indictment charging several acts in the conjunctive ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Id.* at 55–56, 112 S.Ct. 466 (quoting *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970)); *see also United States v. Mitchell*, 85 F.3d 800, 810–811 (1st Cir.1996)(discussing application of *Griffin*). The use of a general verdict form does not invalidate the verdict on Count One. *See United States v. Fisher*, 22 F.3d 574, 576 (5th Cir.1994)(holding that in light of *Griffin*, there is no error in the use of a general verdict form for a conspiracy count).

### III. Sentencing

In light of the convictions that must be vacated, we must also vacate the sentence. We do so without analyzing the alleged errors in sentencing. On remand, the sentencing court will have the full opportunity to re-evaluate and recalculate Blasini's sentence in light of our rulings. *See United States v. Pimienta–Redondo*, 874 F.2d 9, 14 (1st Cir. 1989)("When the conviction on one or more of the component counts is vacated, common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture upon remand, within applicable constitutional and statutory limits if that appears necessary in order to ensure that the punishment still fits both crime and criminal.").

The judgment is VACATED on Counts Two through Five, AFFIRMED on Counts One, Six, Seven and Eight, and REMANDED for re-sentencing. Upon remand, the district court shall enter a judgment of acquittal on Counts Two through Five.