CC-97-244                                                        1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ponce Federal Bank, F.S.B. (ahora Banco Bilbao Vizcaya) Peticionario<br><br>v.<br><br>Chubb Life Isurance Company of America y otros Recurridos | Certiorari<br><br>2001 TSPR 140<br><br>155 DPR \_\_\_\_ |

Número del Caso: CC-1999-441


Fecha: 18/octubre/2001


Tribunal de Circuito de Apelaciones:
                          Circuito Regional I


Juez Ponente:
                          Hon. Yvonne Feliciano Acevedo


Abogado de la Parte Peticionaria:
                          Lcdo. Angel López Hidalgo


Abogado de la Parte Recurrida:
                          Lcdo. Luis A. Falto Cruz


Materia: Incumplimiento de contrato


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ponce Federal Bank, F.S.B.
(ahora Banco Bilbao Vizcaya)

     Peticionario

       v.

Chubb Life Insurance Company     CC-1999-441
of America; Ramiro L. Colón,
Jr., Georgina Ortiz Dexter y
la Sociedad de Gananciales
entre ellos constituida; John
Doe and Jane Doe
Beneficiarios Desconocidos

     Recurridos

**Opinión del Tribunal emitida por el Juez Asociado señor Corrada del Río**

San Juan, Puerto Rico, a 18 de octubre de 2001.

El Ponce Federal Bank, F.S.B., actualmente el Banco Bilbao Vizcaya Argentaria (en lo sucesivo, "Banco" o "el peticionario"), acude ante nos mediante un recurso de *certiorari* en el cual solicita la revisión y revocación de una sentencia del Tribunal de Circuito de Apelaciones, emitida de 7 de mayo de 1999. Dicho foro confirmó, a su vez, otra sentencia dictada por el Tribunal de Primera Instancia que declaró sin lugar la reclamación del Banco y resolvió, en síntesis, que el co-demandado, aquí recurrido, Sr. Ramiro L. Colón Muñoz, no tiene la obligación de devolverle al Banco la suma de $66,575.

Ramiro L. Colón Muñoz (en lo sucesivo, "el recurrido") fungió como Presidente del Banco desde 1979 hasta el 8 de agosto de 1990.[1] Previo al inicio de sus labores en el Banco en 1979, el recurrido disfrutaba de la cubierta de una póliza de seguro de vida que, desde 1954, pagaba su antiguo patrono, la Cooperativa de Cafeteros de Puerto Rico. Cuando en 1979 el recurrido asumió la presidencia del Banco, éste acordó efectuar el pago de dicha póliza como uno de los beneficios laborales marginales.[2] Sin embargo, en 1984, el acuerdo sobre el pago de la póliza se renegoció. Se acordó que el recurrido le transferiría al Banco la titularidad de dicha póliza, debido a consideraciones contributivas.[3] Conforme al acuerdo, el Banco estaría obligado a transferirle la titularidad de la póliza al recurrido tan pronto concluyera el término de su presidencia.[4]

El Banco, por ser una institución de ahorro y préstamos, está bajo la supervisión y jurisdicción directa de la agencia federal que regula las asociaciones e instituciones de ahorro y préstamos, entre otras, conocida como la "Office of Thrift Supervision"[5] (en adelante, "OTS").[6] En agosto de

---

[1] El recurrido, al momento de los hechos, era accionista mayoritario del Banco, y fungía también como Presidente de la Junta de Directores del Banco.

[2] El recurrido y seis (6) ejecutivos lograron conseguir que, como parte de su compensación, el Banco pagara las primas de pólizas de seguro sobre sus vidas. En el caso específico del recurrido, el Banco convino continuar pagando las primas de la póliza que le pagaba su antiguo patrono con la compañía aseguradora Franklin Life Insurance Co. Véase Apéndice, pág. 155.

[3] Las pólizas del recurrido y otros ejecutivos fueron posteriormente transferidas a otra aseguradora, Loyalty Life Insurance Co., bajo un arreglo contributivo conocido como "split-dollar plan". Véase Howard M. Zaritsky, *Structuring Buy-Sell Agreements* §8.02[5][c][iii](1993), Brian H. London, Luis Kreisberg, y Amy Holmwood, *"Split-Dollar Life Insurance: An Old Friend with New Wrinkles"*, 138 Tr. & Est. Núm. 4, 48 (Marzo 1999).

[4] Según surge del expediente, el Banco le explicó a todos los oficiales que "honraría su derecho a la póliza cuya titularidad sería transferida al momento de cesar su empleo con el Banco". Apéndice, pág. 155.

[5] "Since 1989, the primary regulator of savings associations and savings and loan holding companies is the director of the Office of Thrift Supervision. The Office is located in the Department of Treasury and has as its head a director who is subject to the general oversight of the Secretary of the Treasury but who has considerable autonomy to act independently as a matter of federal law [12 U.S.C. §1462a]. The federal statute stipulates that the Secretary of the Treasury may not intervene in any matter or proceeding before the director unless otherwise provided by law. The act makes the director responsible for the examination, safe and

1989, la OTS inició un procedimiento investigativo formal concerniente a ciertas transacciones y negocios que había efectuado el Banco. En particular, la investigación se centró en ciertas irregularidades y prácticas bancarias ilegales que se sospechaba había incurrido el recurrido conjuntamente con su hermano, el Lcdo. Wendell W. Colón, abogado del Banco.[7] La investigación surgió como resultado de los hallazgos contenidos en un informe que preparó la OTS, a principios de 1989, una vez concluido un proceso de auditoría.

En una reunión celebrada el 16 de julio de 1989, representantes de la OTS le informaron a la Junta de Directores del Banco que, a raíz de las irregularidades que habían detectado, se estaría iniciando un procedimiento administrativo formal en contra de la Junta, el Banco, el recurrido y su hermano (conjuntamente denominados en lo sucesivo, "los querellados"). Se indicó que a través del mismo se procuraría la eventual destitución del recurrido de la presidencia del Banco, entre otras medidas. Luego de dicha reunión, el recurrido comenzó inmediatamente a negociar con el Banco un acuerdo de retiro (en adelante, "el acuerdo de retiro").

El 8 de agosto de 1990, el recurrido suscribió un acuerdo con la Junta de Directores en virtud del cual acordó retirarse de su cargo como Presidente del Banco, a cambio de la obtención de un número de beneficios marginales. Conforme a ello, acordaron que el recurrido recibiría, *inter alia*, la suma

---

sound operation, and regulation of savings associations. [12 U.S.C. §1463 (a) (1)]". Milton R. Schroeder, *The Law and Regulation of Financial Institutions* §2.03[2][a] (1995).

[6] "The term 'thrift' encompasses various types of state and federally chartered financial institutions that traditionally invested primarily in single-family residential mortgages. These institutions include building and loan associations, savings and loan associations, cooperative banks, homestead associations, and savings banks". Note, David B. Toscano, "Forbearance Agreements: Invalid Contracts for the Surrender of Sovereignty", 92 Columbia Law Review 426, nota al calce núm. 1 (1992).
La palabra "thrift" se traduce al español como ahorro, frugalidad o economía. *Diccionario español-inglés/inglés-español*, Larousse, pág. 636 (1995).

[7] Apéndice, pág. 45. Por no ser particularmente relevante al caso de autos, no será necesario hacer un recuento más detallado y específico sobre las prácticas bancarias ilegales y las irregularidades incurridas por los hermanos Colón Muñoz. Para ello véase Apéndice, págs. 43-75; véase además

de $615,500 a título de saldo por su retiro ("severance pay"). El recurrido recibiría otra suma de $14,137.50 como compensación mensual por continuar desempeñándose provisionalmente como Presidente de la Junta de Directores hasta el 31 de diciembre de 1990.[8] El Banco se comprometió además a suplirle un automóvil y un teléfono celular, así como a pagar las cuotas del Club Deportivo, el Club Náutico y el Bankers Club. Finalmente, el Banco acordó traspasarle la titularidad de la póliza de seguro de vida antes mencionada, y también **pagarle por adelantado las primas correspondientes a treinta (30) meses, cantidad que ascendía a $66,575.00.**

De conformidad, la Junta de Directores aprobó mediante resolución de 9 de agosto de 1990 transferir la titularidad de la  póliza  de seguro de vida al recurrido, así como realizar el pago por adelantado de las primas de seguro de los próximos treinta (30) meses. El Banco expidió un cheque por la suma de $66,575 a favor de Chubb Life Insurance Company of America ("Chubb Life"), a la vez que le solicitó a la aseguradora la tramitación del mencionado traspaso de titularidad de la póliza de vida. Conjuntamente con dicha solicitud, el Banco otorgó y sometió a Chubb Life un documento que evidenciaba su intención de transferirle la titularidad de la póliza al recurrido, y todo interés que pudiese tener en la póliza a expedirse.[9] La renuncia del recurrido como Presidente del Banco fue efectiva el 9 de agosto de 1990.

El 23 de agosto de 1990, la OTS dio inicio al anticipado procedimiento administrativo de adjudicación en contra de los querellados. La agencia

---

*U.S. v. Colón-Muñoz*, 192 F.3d 210 (1999) (1er Cir.); y *U.S. v. Blasini-Lluberas*, 169 F.3d 57 (1999) (1er Cir.).

[8] Según se estipuló en el acuerdo de retiro: "Mr. Colón will remain as Chairman of the Board of Directors of Ponce Federal until December 31, 1990. During such time Mr. Colón shall perform his functions as Chairman of the Board and assist with the orderly transition of Ponce Federal's senior management. In consideration for such services, in assisting with the orderly transition of Ponce Federal's senior management, Mr. Colón shall be paid the sum of $14,137.50 per month, shall be reimbursed for all ordinary and necessary expenses incurred in connection with his performance of such services, and shall be furnished an office and a secretary at Ponce Federal." Apéndice, pág. 209.

[9] Dicho documento fue suscrito por el Banco a través del Sr. José Vidal, Vicepresidente de Recursos Humanos. Apéndice, pág. 159.

notificó una serie de decretos[10] mediante los cuales ordenó, entre otras medidas, la inmediata suspensión del recurrido de su cargo como presidente del Banco y de la Junta de Directores; la suspensión de concesiones y beneficios que el recurrido pudiese obtener del Banco, incluyendo aquellos beneficios nacidos del acuerdo de retiro; y una prohibición absoluta de participar en gestiones administrativas y comerciales con el Banco y sus miembros. Además se le impuso al recurrido y a su hermano la responsabilidad solidaria de consignar una fianza por la suma de $50,000, a manera de fondo de restitución monetaria a favor del Banco.

Las órdenes emitidas por la OTS denunciaban, en síntesis, que el recurrido y su hermano violaron su deber fiduciario hacia los depositantes y accionistas del Banco, al incurrir en prácticas bancarias impropias e ilegales, demostrando un grave menosprecio hacia la estabilidad y solidez del Banco, ello en clara violación de las leyes y los reglamentos federales.[11]

Así las cosas, el recurrido inició comunicaciones con la OTS con el fin de transigir los cargos en su contra. El 7 de marzo de 1991, la OTS y el recurrido lograron llegar a un acuerdo de transacción (en adelante, "acuerdo de transacción"). Ello se logró al amparo de la autoridad que le concede a dicha agencia la sección 8 del *Federal Deposit Insurance Act*, según enmendada, 12 U.S.C.A. sec. 1818 (en adelante, "FDIA").[12] Mediante dicho acuerdo de transacción, el recurrido consintió a que la OTS emitiera una Orden Final en su contra, sin que tuviese que admitir o negar los cargos

---

[10] En específico la OTS emitió los siguientes decretos: "Temporary Pre-Hearing Order (Including Order of Suspensión)", Apéndice, pág. 43; "Order of the Director Authorizing Commencement of Enforcement Action and Issuance of Pre-Hearing Temporary Order Regarding Ponce Federal Bank, F.S.B., Ponce, Puerto [Rico], and Institution-Affiliated Parties Thereof", Id., pág. 53 ; "Notice of Charges (Removal and Prohibition)(Cease-and-Desist)", Id., pág. 57.

[11] Posteriormente, en 1995, al recurrido se le imputó la comisión de varios delitos federales por hechos relacionados. Luego de un prolongado procedimiento judicial, un jurado finalmente lo declaró culpable, y el 20 de abril de 1998, un Juez federal lo sentenció a cumplir una pena de veintiún (21) meses de cárcel seguido de dos (2) años de probatoria, y el pago de una multa de $20,000. Véase *U.S v. Colón-Muñoz, supra*. Asimismo el recurrido, quien es abogado, fue separado indefinidamente del ejercicio de la abogacía por este Tribunal. *In re: Colón Muñoz*, res. el 27 de octubre de 1999, 149 D.P.R. ___, 99 T.S.P.R. 174, 99 J.T.S. 173.

administrativos en su contra. Conforme a dicha Orden Final, el recurrido

convino renunciar a su derecho a una vista administrativa, y su derecho a

solicitar una revisión judicial. A cambio, la OTS acordó limitarse a poner

en vigor la Orden Final y a no iniciar procedimiento alguno adicional en

contra del recurrido por los hechos que surgían del informe de la agencia.

Por su obvia pertinencia al caso de autos, a continuación citamos las partes

más relevantes del acuerdo de transacción:

> WHEREAS, the Director of the [OTS], on August 23, 1990, commenced the above-mentioned administrative enforcement proceeding by issuing and serving a Notice of Charges (the "Notice of Charges") on the respondents, including Ramiro L. Colón, Jr. ("Ramiro Colón); and
>
> WHEREAS, Ramiro Colón has **executed a Stipulation** attached hereto as Exhibit A and incorporated herein by reference (the "Stipulation") whereby, without admitting or denying the charges set forth in the Notice of Charges, he stipulates and consents to the issuance of this Order,
>
> NOW THEREFORE, the Director of the OTS, pursuant to subsections (b) and (e) of Section 8 of the [FDIA], as amended, HEREBY ORDERS as follows:
>
> 1. [. . .] Ramiro Colon is hereby prohibited from holding any office at, or otherwise participating in any manner in the conduct of the affairs of, the following institutions . . . : Ponce Federal Bank, F.S.B. . . . ; any other insured depository institutions . . . .
>
> 2. [. . . .]
> 3. [. . . .]
> 4. (a) Also in accordance with Section 8(b) of the FDIA, as amended, Ramiro Colón is hereby ordered to make payment (the "Payment") to the Bank of $1,044,101, which represents (i) $615,500 paid to him on or about August 8, 1990, pursuant to the Retirement Agreement (the "Retirement Agreement") dated August 8, 1990 by and between the Bank and Ramiro Colón; (ii) $418,601 paid to him (or for his benefit) from time to time as a result of the Bank´s advance indemnification or for the legal fees incurred by Ramiro Colón (and Wendell Colón) in connection with the above-captioned matter; and (iii) $10,000, representing accrued interest on the foregoing sums;
>
> (b) [. . . .]
>
> 5. Within two (2) Puerto Rican business days following service of this Order on counsel for Ramiro Colón, Ramiro Colón shall provide the OTS with written notice and evidence of his compliance with the requirements of Paragraphs 3 and 4 of this Order. [. . . .]
>
> 6. **The Retirement Agreement is hereby rescinded and of no further force and effect;**
>
> 7. All technical words or phrases used in this Order, for which meanings are not otherwise specified or otherwise provided by the provisions of this Order, shall insofar as applicable, have the meanings set forth in on or more of the following laws and regulations: the Home Owners Loan Act, as amended by FIRREA; the FDIA, as amended by FIRREA; and the regulations of the OTS, as codified in the Code of Federal Regulations, Title 12, Chapter V (or currently published in the Federal Register). Any technical words of phrases

---

[12] En lo sucesivo, cuando nos refiramos a "la sección 8" significamos el artículo del FDIA codificado en 12 U.S.C. sec.1818.

not subject to definition in the foregoing laws and regulations shall have meanings that accord with the best custom and usage in the savings association industry.

8. This ORDER shall be and is effective and enforceable upon service on counsel of record for Ramiro Colón.[13] (Énfasis suplido; escolio omitido.)

Una vez suscrito el acuerdo de transacción, el recurrido procedió a dar cumplimiento a la Orden Final, de modo que devolvió todos los beneficios que había obtenido mediante el acuerdo de retiro. No obstante, nunca reembolsó el pago de $66,575 correspondiente a treinta (30) meses de las primas del seguro de vida, aunque varias veces el Banco lo solicitó.

El 31 de agosto de 1991, el Banco solicitó a Chubb Life la invalidación del cambio de titularidad de la póliza que había efectuado a favor del recurrido y el reembolso de la suma de $66,575 que había abonado a su favor. A esta solicitud respondió Chubb Life, a través del Sr. Jaime Colón, agente a cargo de la póliza, informando que para ello primero sería necesario que la Junta de Directores del Banco emitiera una resolución corporativa que revocara la resolución emitida el 8 de agosto de 1990, así como un documento que acreditara el consentimiento del recurrido.

Por resultar infructuosas todas las gestiones extrajudiciales hechas por el Banco, el 11 de junio de 1992, éste instó una demanda contra Chubb Life, el recurrido, Georgina Ortiz Dexter, la sociedad legal de bienes gananciales compuesta por ambos, y cualquier beneficiario desconocido de la póliza. Alegó, primero, que los demandados tenían la obligación de devolver los $66,575 que el Banco pagó por concepto de primas de seguro de vida; y, segundo, que debía invalidarse el cambio de titularidad de la póliza efectuado a favor del recurrido.

El fundamento de la demanda fue que al suscribir el acuerdo de transacción con la OTS, el recurrido "rescindió" de manera expresa y voluntaria el acuerdo de retiro que había suscrito anteriormente con el Banco. Por tanto, el Banco alegó que éste venía obligado a devolver todas las prestaciones nacidas del acuerdo de retiro, incluyendo los pagos hechos

---

[13] Véase "Stipulation to Order to Ramiro L. Colón, Jr.", Apéndice, págs. 87-95.

por adelantado a la póliza del seguro de vida. Señaló asimismo que la obligación del recurrido con la aseguradora era personal, por lo que al haber satisfecho el pago de la póliza, con el consentimiento del recurrido, el Banco tiene ahora un crédito en su contra por dicha cantidad, a tenor del artículo 1112 del Código Civil, 31 L.P.R.A. sec. 3162.

En cuanto a Chubb Life, el Banco sostuvo que era responsable por aquella parte de los $66,575 de las primas pagadas por adelantado que al momento de la solicitud de reembolso –31 de agosto de 1991– no habían sido devengadas.

El recurrido contestó la demanda aceptando, en esencia, la mayoría de las alegaciones. Aceptó inclusive que en la Orden Final emitida por la OTS se indicó claramente que el acuerdo de retiro concertado con el Banco quedó "rescindido". Negó, sin embargo, que la Orden Final administrativa cubriese de manera específica la póliza de seguro de vida de Chubb Life y el pago por adelantado de las primas, por lo cual rechazó que estuviese obligado a devolver dicha suma.

Al cabo de dos (2) años de litigio, el 14 de noviembre de 1994, el Banco y Chubb Life llegaron a un acuerdo. Sometieron por tanto a la consideración del tribunal una "Estipulación de transacción y solicitud de sentencia parcial".[14] A tenor de la misma, dichas partes desistieron con perjuicio de cualquier reclamación que tuvieran o pudieran tener entre sí a consecuencia de los hechos alegados en la demanda. Además, la compañía aseguradora acordó allanarse a lo que el tribunal de instancia tuviese a bien disponer sobre la titularidad de la póliza y las primas pagadas por el Banco, y los demás beneficios consignados en dicha póliza. En igual fecha, el Tribunal de Primera Instancia (TPI) dictó una sentencia parcial aprobando la transacción, en la cual declaró "que Ramiro Luis Colón Muñoz **es el titular** de la póliza ...".[15] No obstante, quedó sin resolverse si procedía o no la devolución de la suma de $66,575.

---

[14] Apéndice, pág. 118.

[15] Apéndice, pág. 533. (Énfasis suplido.) Asimismo, como veremos, ninguna de las partes impugnó esta determinación.

El 20 de marzo de 1996, el TPI emitió sentencia final reiterando primeramente que la titularidad de la póliza pertenecía al recurrido, ya que así lo había acordado con el Banco y "estaba muy claro que al terminar la relación de trabajo, [éste] recuperaría su póliza".[16] Concluyó asimismo que la transacción realizada entre el recurrido y

---

[16] Apéndice, pág. 537.

la OTS **no** podía tener **un efecto retroactivo** de "rescindir" el acuerdo de retiro, tal como si se tratara de una mera cancelación de los **efectos** del acuerdo de retiro. Ello, a base de que "el término rescindir en una ley federal y en una orden consentida dictada bajo la Autoridad [*sic*] de OTS no es el mismo que se da en el artículo 1243 del Código Civil".[17] Además, el TPI subrayó el hecho de que el asunto de la devolución del pago de $66,575 no fue específicamente mencionado en el acuerdo de transacción. En fin, el TPI sentenció que "el efecto de la rescisión fue la cancelación prospectiva, excepto lo que se dispuso de otra forma"; y seguido añadió que "la cancelación en nuestro sistema significa terminación de efectos y no devolución".[18] Así, pues, concluyó que el recurrido no estaba obligado a devolver el pago de $66,575 efectuado a su favor.[19]

De esta sentencia acudió el Banco ante el Tribunal de Circuito de Apelaciones (TCA), mediante recurso de apelación, el 14 de noviembre de 1997. Dicho tribunal, emitió sentencia el 7 de mayo de 1999, confirmando la dictada por el foro de instancia, y disponiendo en parte que:

> A diferencia del Derecho Civil, en el Derecho contractual norteamericano es posible rescindir un contrato por acuerdo entre las partes. Tal situación, sin embargo, no implica la devolución o restitución de las prestaciones objeto del contrato, su frutos o intereses.
> . . . .
> Coincidimos con el demandado-apelado en que el término "rescinded" utilizado en la orden de la OTS se refiere al "rescission" del Derecho anglo-americano. Solo así es posible que las partes <u>convinieran</u> finalizar el contrato o acuerdo de retiro.[20]

El 16 de junio de 1999 el Banco presentó recurso de *certiorari* ante este Tribunal planteando la comisión del siguiente error:

---

[17] Apéndice, pág. 546.

[18] Apéndice, págs. 549-550.

[19] Por último, cabe señalar que el TPI condenó a la parte demandante al pago de costas y de $5,000.00 en concepto de honorarios de abogado por temeridad. Indicó, además, que sobre la sentencia se pagaría el interés legal de 9.75% a tenor de la Regla 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Oportunamente, el Banco solicitó determinaciones adicionales de derecho. Así, el 14 de octubre de 1997, el Tribunal emitió una resolución aclarando que el interés legal le aplicaba a la cantidad concedida por concepto de honorarios de abogado. Dicho dictamen fue archivado en autos y notificado a las partes el 16 de octubre de 1997.

Erró el Tribunal de Circuito de Apelaciones al excluir de los efectos de la rescisión, los pagos recibidos por el codemandado Ramiro L. Colón Muñoz dando sólo efectos prospectivos a un acuerdo de rescisión.

Expedimos mandamiento de *certiorari* mediante resolución de 27 de agosto de 1999. Las partes han comparecido con sus respectivos alegatos. Estamos en posición de resolver, y así lo hacemos.

II

Primeramente, nos corresponde aclarar y definir brevemente las diferentes relaciones contractuales que, *prima facie*, surgen de los hechos del presente caso, de modo que luego podamos examinar con mayor certeza los derechos personales que surgen a raíz de dichas relaciones.

La primera relación contractual que debemos destacar es el contrato laboral que el recurrido y el Banco establecieron en 1979. Dicha relación laboral terminó cuando, en 1990, el recurrido renunció a su puesto como Presidente del Banco, razón por la cual se originó un segundo contrato: el acuerdo de retiro, que, al igual que el primero, fue suscrito por el recurrido y el Banco. Finalmente, nació en 1991 un tercer acuerdo: el acuerdo de transacción. Deseamos puntualizar sin embargo que, a diferencia de los primeros dos acuerdos, el Banco no fue parte en el de transacción. Este tercer acuerdo se formalizó exclusivamente entre el recurrido y la OTS, un órgano administrativo del gobierno federal.

El presente caso se originó precisamente por las diversas interrogantes y desiguales interpretaciones que, tanto el Banco, como las partes contratantes, dan acerca del alcance que tuvo dicho acuerdo de transacción y sus efectos sobre el preexistente acuerdo de retiro. Es preciso recordar que en el sexto inciso de dicho acuerdo de transacción se dispuso que "The Retirement Agreement is hereby **rescinded** and of no further force and effect". Las partes en el presente caso chocan, pues, en sus interpretaciones acerca del significado de la palabra "rescinded" y la forma en que se pueda hacer cumplir o ejecutar esa llamada "rescisión".

---

[20] Apéndice, págs. 8-9. Al igual que el TPI, el TCA subrayó el hecho que el acuerdo de transacción no menciona específicamente la devolución del pago por adelantado de las primas al Banco.

Amparándose en dicha controversia,[21] el recurrido sostiene –ahora con el asentimiento de los tribunales inferiores– que no viene obligado a reembolsarle al Banco la suma $66,575. Veamos.

III

Para resolver el presente caso resulta indispensable reseñar el esquema reglamentario federal de las instituciones depositarias o de ahorro.[22] Como resultado histórico del desarrollo de la economía estadounidense durante el siglo pasado, el Congreso estableció varias agencias federales para reglamentar la industria bancaria y financiera en Estados Unidos de América (en adelante, "E.U.A.").[23]

Durante la época conocida como la Gran Depresión, el Congreso de E.U.A. aprobó varios estatutos específicamente dirigidos a estabilizar las

_____

[21] En origen el Banco planteó en el TPI dos (2) controversias jurídicas; a saber: 1) la procedencia de la devolución de $66,575; y 2) la procedencia de la invalidación del cambio de titularidad de la póliza de seguro de vida que éste efectuó a favor del recurrido al momento de retirarse, en 1990.

En cuanto al segundo planteamiento formulado ante el TPI, el Banco alegó en la demanda que dicho traspaso se efectuó basándose en el acuerdo de retiro que, según su interpretación, fue "rescindido" posteriormente por el acuerdo de transacción. Dicha "rescisión" –argumentó el Banco— obligaba a las partes demandadas a devolverle la titularidad. El foro de instancia resolvió dicha controversia al establecer mediante Sentencia Parcial que la titularidad de la póliza pertenecía al recurrido, ya que así lo había acordado con el Banco en 1984 y "estaba muy claro que al terminar la relación de trabajo, [éste] recuperaría su póliza". Apéndice, pág. 537. La Sentencia Parcial nunca fue impugnada, ya que el Banco y Chubb Life estipularon sería "final, firme e inapelable desde el momento en el cual se dicte". Apéndice, págs. 119–120. Así pues quedó aclarada la controversia sobre la titularidad de la póliza.

[22] En adelante utilizaremos el término "instituciones depositarias". El término comúnmente utilizado en los estatutos federales es "depository institutions". El Federal Deposit Insurance Act define dicho término como "any bank or savings association", 12 U.S.C. sec. 1813(c)(1); mientras que el Federal Reserve Act incluye en su definición a las "insured credit union[s] or [] credit union[s] eligible to make application to become [] insured credit union[s]". 12 U.S.C. sec. 461(b)(1)(A). De modo,

**continúa…**

_____

[22] **...continuación**

que el término "depository institutions" es más abarcador, es decir, no se limita meramente a instituciones tales como los bancos comerciales. Véase Schroeder, *op. cit.*, §2.02. Por ello utilizaremos el término "instituciones depositarias" en vez del término "instituciones bancarias".

[23] Entre otros, el Board of Governors of the Federal Reserve System, que administra el Federal Reserve System; la Federal Deposit Insurance Corporation, una corporación pública (en adelante, "FDIC"); la Resolution Trust Corporation; la Office of the Comptroller of the Currency y la OTS que son divisiones del Departamento del Tesoro de E.U.A.; entre otras agencias.

instituciones depositarias, que atravesaban su peor crisis.[24] Mediante

dichos estatutos se creó la junta conocida como el Federal Home Loan Bank

Board ("FHLBB"). Ésta se encargaría de autorizar y regular las instituciones

depositarias. También se creó la corporación pública denominada Federal

Savings and Loan Insurance Corporation ("FSLIC"), para servir como

aseguradora de las instituciones depositarias autorizadas por el FHLBB.

Éstas fueron, sin duda, dos de las instituciones federales más importantes

de la industria, ya que fueron responsables de preservar la estabilidad del

sector financiero por más de cuatro décadas. Sin embargo, la estabilidad

de las instituciones depositarias en E.U.A. se comenzó a ver amenazada

nuevamente al final de la década de 1970, cuando la tasa de interés y la

inflación aumentaron drásticamente, afectándose la economía y

propiciándose, a su vez, la bancarrota de muchas de esas instituciones.[25]

Consecuentemente, en 1989, el Congreso tomó medidas para remediar la

situación. El resultado fue la aprobación del *Financial Institutions*

*Reform, Recovery, and Enforcement Act* ("FIRREA").[26] Mediante dicho estatuto

el Congreso eliminó la casi insolvente FSLIC; abolió también el FHLBB. La

FSLIC fue sustituida por la FDIC; el FHLBB, por su parte, también fue abolido

por FIRREA para ser sustituido por una nueva agencia que gozaría de mayores

poderes fiscalizadores, la recién creada OTS. En otras palabras, la OTS es

la agencia federal sucesora del FHLBB. *First Gilbraltar Bank, FSB v.*

*Morales*, 19 F.3d 1032 (1994).[27]

---

[24] Véase *Transohio Savings Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 601 (D.C. Cir. 1992). Por ejemplo, el Congreso aprobó el *Federal Home Loan Bank Act*, 12 U.S.C. secs. 1421-49; el *Home Owner´s Loan Act*, 12 U.S.C. secs. 1461-68c; y el *National Housing Act*, 12 U.S.C. secs. 1701-50g. Véase además Note, Jessica Ansell Hauser, "Nonconsensual Repeal of Third-Party Beneficiary Contract Rights: Senior Creditors Under Subordination Agreements", 8 Cardozo Law Review 1227, 1228 (1987).

[25] *Ibid.* La industria bancaria y financiera en los E.U.A. atravesó dos grandes períodos de crisis en la década de los años 1980. La primera crisis tuvo un término de duración de tres años, desde 1980 al 1983; la segunda crisis del sector comenzó aproximadamente en el 1986 hasta que se estabilizó en 1989. Véase Lawrence J. White, *The S&L Debacle* 67-97 (1991).

[26] Pub.L. No. 101-73, 103 Stat. 183 (1989).

[27] Como indicamos anteriormente, la OTS es la agencia federal que, desde 1989, se le ha encomendado regular las asociaciones e instituciones financieras dedicadas a contratos de depósitos de ahorro y transacciones

Ahora bien, en 1966 el Congreso aprobó la conocida sección 8, a través del *Financial Institutions Supervisory Act of 1966* ("FISA").[28] Con ello se logró un importante paso de avance en la reglamentación de la industria bancaria. La sección 8(b) de FISA dispone que:

> (1) If, in the opinion of the appropriate Federal banking agency, any insured depository institution . . . or any depository institution-affiliated party is engaging or has engaged, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to engage, in an **unsafe or unsound practice** in conducting the business of such depository institution . . . the agency may issue and serve upon the depository institution of such party a **notice of charges** in respect thereof. [If] the agency shall find that any violation or unsafe or unsound practice specified in the notice of charges has been established, the agency may issue and serve upon the depository institution or the institution-affiliated party an **order to cease and desist** from any such violation or practice. Such order may . . . require the depository institution or its institution-affiliated parties to cease and desist from the same, and, further, to **take affirmative action** to correct the conditions resulting from any such violation or practice.
> (2) A cease-and-desist order shall become effective at the expiration of thirty days . . . (**except in the case of a cease-and-desist order issued upon consent**, which shall become effective at the time specified therein), and shall remain effective and enforceable as provided therein, except to such extent as it is stayed, modified, terminated, or set aside by action of the agency or a reviewing court.
> (3) . . .
> (4) . . .

de crédito; o como bien indica el profesor Milton Schroeder, la OTS es "the primary regulator of savings associations and savings and loan holding companies". Milton R. Schroeder, *The Law and Regulation of Financial Institutions* §2.03[2][a], (1995).

[28] Pub.L. No. 89-695, 80 Stat. 1028 (codificado en distintas secciones que se encuentran dispersas a través de 12 U.S.C.). Ahora bien, como veremos, el asunto de autos requerirá sólo el examen específico de la sección 8(b) de FISA. 12 U.S.C. sec. 1818(b).

Asimismo, cabe señalar que dicha sección sufrió varias enmiendas en el 1978, mediante el *Financial Institutions Regulatory and Interest Rate Control Act of 1978*, Pub.L. 95-630 (1978). La enmienda, sin embargo, de modo alguno alteró el propósito básico del estatuto:

> "[T]he simple effect of this amendment was to give the . . . authority to issue an order against a particular director, officer or employee to cease and desist from engaging in unsound or unsafe banking practices or from violating a particular bank law or rule, rather than having to bring an action against the bank itself . . .". *Larimore v. Comptroller of Currency*, 789 F.2d 1244 (1986) (7mo. Cir.).

La enmienda, además, proveyó la facultad administrativa de remover de las juntas de instituciones depositarias y/o de sus cargos a aquellos empleados del banco que, mediante sus actos, hayan demostrado un serio menosprecio a la estabilidad de la institución. Véase 12 U.S.C. sec. 1818(e)(1); véase además *Sunshine State Bank v. Federal Deposit Ins. Corp.*, 783 F.2d 1580, 1582 (1986) (11vo. Cir.).

(5) . . .
    (6) Affirmative action to correct conditions resulting from violations or practices. The authority to issue an order under this subsection and subsection (c) of this section . . . includes the authority to require such depository institution or such party to—
    (A)**make restitution or provide reimbursement,** indemnification, or guarantee against loss if—(i)such depository institution or such party was **unjustly enriched** in connection with such violation or practice; or (ii)the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the appropriate Federal banking agency;
    (B). . .
    (C). . .
    (D)**rescind agreements or contracts**; and
    (E). . .
    (F)take such action as the banking agency determines to be appropriate. 12 U.S.C. sec. 1818(b). (Énfasis suplido.)

Resulta claro que dicha sección provee un mecanismo de regulación que no es exclusivo de una sola agencia, sino de todas las agencias que intervienen en la reglamentación y supervisión de la industria –"appropriate Federal banking agenc[ies]"— incluyendo a la OTS, (en adelante nos referiremos a dichas agencias como "agencias reglamentadoras de la industria financiera"). A su vez, la sección 8(b) aplica sólo a las instituciones depositarias que estén aseguradas por el FDIC. *Gross Nat. Bank v. Comptroller of Currency*, 573 F.2d 889 (1978) (5to. Cir.).

Cabe señalar asimismo que al aprobar dicho esquema administrativo el Congreso no tenía la intención de proteger los intereses individuales o privados de las instituciones depositarias, sino proteger el interés público y preservar la estabilidad económica del sector financiero y de la nación entera:

    These agencies are charged with the task of overseeing that banking system for the protection of the public and the national economy as a whole, and not for the benefit or protection of individual banking institutions. The most significant of their supervisory powers is the capacity to issue and enforce cease and desist orders. The agencies may draw upon this power to prevent a bank from violating any agreements with [the agency]; to remedy violations of any "law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the bank,"; or to prohibit any banking practice or procedure that the [agency] deems to be "unsafe or unsound." In short, cease and desist orders can be utilized to regulate virtually every aspect of a bank's business. *First Nat. Bank of Scotia v. U.S.*, 530 F.Supp 162, 166 (D.C.D.C., 1982). (Citas internas omitidas.)

Debemos subrayar además que, en origen, la sección 8(b) autorizaba sólo la presentación de órdenes de "cease-and-desist" en contra de los bancos.

En 1978, sin embargo, el Congreso la enmendó para incluir dentro del alcance de la autoridad administrativa de estas agencias la facultad de presentar dichas órdenes en contra de los directores y oficiales de las instituciones depositarias.

Fue precisamente al amparo de la versión enmendada de la sección 8(b) que, el 23 de agosto de 1990, la OTS emitió una serie de decretos, que incluyó, *inter alia*, una notificación de cargos ("notice of charges") en contra del Banco, el recurrido y los demás querellados. Fue al amparo de dicha disposición que la OTS aprobó el "Stipulation to Order" de 7 de marzo de 1991, o sea, el acuerdo de transacción entre el recurrido y dicha agencia, el cual entró en vigor inmediatamente. Véase 12 U.S.C. 1818(b)(2).[29]

IV

Pasamos, pues, a examinar el asunto específico de los poderes administrativos que poseen las agencias reglamentadoras de la industria financiera, particularmente, la OTS. El Profesor Schroeder explica en su tratado de derecho bancario:

> Banking agencies may enter into formal agreements with depository institutions or institution-affiliated parties in which those persons undertake to take action or refrain from certain action in managing the affairs of their institutions. **A banking agency may enforce such an agreement** by using its administrative powers to issue cease and desist orders.[30] Other enforcement measures may be used as well. When an institution-affiliated party violates "any condition imposed in writing by the appropriate Federal banking agency in connection with the grant of any application or other request by such depository institution; or . . . any written agreement between such depository institution and such agency,"[31] the banking agency may exercise its removal and prohibition authority with respect to that party.[32] Additionally, the violation of a written condition or

---

[29] La subsección (b)(2) se refiere específicamente a "cease and desist order **issued upon consent**". 12 U.S.C. sec. (b)(2). (Énfasis suplido.) Este tipo de órdenes emitidas por las agencies reglamentadoras de la industria financiera, por tanto, se ha denominado como "consent orders". Véase Schroeder, *op. cit.*, §10.01[2]. Conforme a ello, adoptaremos la traducción "órdenes por consentimiento" para referirnos a dichas órdenes de manera general.

[30] 12 U.S.C. secs. 1818(b)(1), (c)(1).

[31] 12 U.S.C. secs. 1818(e)(1)(A)(i)(III), (IV).

[32] 12 U.S.C. secs. 1818(e)(1).

agreement by an institution or an institution-affiliated party may subject them to a civil money penalty.[33]

Luego, al explicar el estatuto federal, añade que:

A consent order between the agency and an institution or institution-affiliated party may give the banking agency even stronger enforcement powers. Although the agency will have available the full range of civil money penalties and powers to prohibit or remove individuals from participation in the affairs of the institution for a violation of its order, **the agency "in its discretion"** also may apply directly **to a United States district court** for an **injunction to enforce "any effective and outstanding notice or order" issued by the agency.**[34] The agency does not need to first conduct an administrative hearing because that part of the process was waived when the institution or institution-affiliated party consented to the final cease and desist order. Because this will be an enforcement proceeding, not a proceeding to review the merits of the agency's issuance of the order the institution or institution-affiliated party will not have an opportunity to challenge the adequacy of the substantive or procedural grounds for issuing the order. **By consenting to the cease and desist order,** the institution or party **forfeits** the right to judicial review of the order **which is the exclusive method** for obtaining review, modification, or negation of a banking agency cease and desist order.[35] Schroeder, *op. cit.*, §10.01[2]. (Énfasis suplido; escolio omitido.)

Surge claramente que las agencias reglamentadoras de la industria financiera gozan de amplios poderes al amparo de la sección 8(b) de FISA, entre los cuales se encuentra el poder de emitir órdenes de "cease and desist". Queda claro también que éstas tienen amplia facultad para hacer cumplir dichas órdenes. En cuanto a las órdenes por consentimiento, el estatuto federal dispone categóricamente que dichas agencias tienen **discreción** para acudir **a la Corte de distrito federal** mediante recurso de *injunction* y solicitar que se haga cumplir dichas órdenes. La ley dispone que la agencia **"may in its discretion** apply to the United States district court of any territory . . . for the enforcement of any effective and outstanding notice or order issued . . . and such courts shall have jurisdiction** and power **to order and require compliance** herewith . . .".** 12 U.S.C. sec. 1818(i)(1). (Énfasis suplido.)

Por otra parte, el estatuto federal dispone categóricamente que ningún otro tribunal tendrá jurisdicción para hacer cumplir o ejecutar las órdenes

---

[33] 12 U.S.C. secs. 1818(i)(2)(A)(iii), (iv).

[34] 12 U.S.C. secs. 1818(i)(1).

[35] 12 U.S.C. secs. 1818(h)(1).

dictadas por las agencias federales que reglamentan la industria financiera: "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order". *Id*. Nótese que el Congreso específicamente dispuso en el estatuto que **"no court** shall have jurisdiction", **de manera que ningún tribunal, federal o estatal, tiene jurisdicción para ejecutar una orden de la OTS, que surge de un decreto por consentimiento, a no ser que la propia OTS así lo solicite, a su discreción, a la corte de distrito federal.** (Énfasis suplido.) Véanse *Board of Governors of Federal Reserve System v. Mcorp Financial, Inc*., 112 S.Ct. 459 (1991)("the congressional preclusion of review in FISA is clear: 'no court shall have jurisdiction to affect . . . the enforcement . . . 12 U.S.C. s1818(i)(1)'"); *First Nat. Bank of Scotia v. U.S., supra*; *Abercrombie v. Office of Comptroller of Currency*, 641 F.Supp. 598, 600 (S.D. Ind., 1986); *Gross Nat. Bank v. Comptroller of Currency*, supra, pág. 894.

En resumen, de lo anterior podemos colegir lo siguiente: 1) que la sección 8(b) de FISA provee un remedio legal o recurso (e.g., el *injunction*) para ejecutar y hacer cumplir las órdenes dictadas por las agencias reglamentadoras de la industria financiera, incluyendo las órdenes dictadas por consentimiento; 2) el estatuto dispone claramente que dichas agencias federales son las acreedoras **exclusivas** del derecho a solicitar dicho remedio, y no los bancos; y 3) dicho estatuto establece específicamente que el **único** foro judicial que tiene jurisdicción para hacer cumplir dichas órdenes es la Corte de Distrito Federal.

Por lo tanto, es ineludible la conclusión de que el Banco no tiene legitimación en causa **para hacer cumplir o ejecutar el acuerdo de transacción** concertado entre el recurrido y la OTS. Ello es una prerrogativa exclusivamente concedida por ley a favor de la OTS, para ser ejercida por ésta, conforme a su discreción[36]. Es decir, que el Banco carece de *standing*

---

[36] Debemos advertir que pasadas algunas semanas luego de que se firmó el acuerdo de transacción, la OTS condujo una investigación rutinaria o

para reclamar algún derecho a base del acuerdo de transacción, inclusive para solicitar la ejecución o el cumplimiento específico del mismo.[37]

Más importante aún, los tribunales de Puerto Rico carecen de jurisdicción para hacer cumplir ("*enforce*") dichos acuerdos, ya que el Congreso, a través de la sección 8(b) de FISA, así lo dispuso. El Congreso fue categórico al indicar que quien tiene jurisdicción exclusiva para adjudicar dichos asuntos es la Corte de Distrito federal. 12 U.S.C. sec. 8(b)(i)(1)("the United states district court, or the United States court of any territory"). Y, como se sabe, los tribunales no tenemos discreción

---

"regular" del Banco. Ello, al amparo de las "Rules and Regulations for the Insurance Accounts", 12 C.F.R. §§225.5(c) 261.2(j). Asimismo, se nombró un examinador oficial administrativo, el Sr. Brett Bouchard, para que efectuara la investigación. Según surge del informe, que aparece en el récord, éste concluyó que pese a que el recurrido había devuelto la mayoría de los beneficios que obtuvo de su acuerdo de retiro, aún no le había devuelto al Banco varios activos: "[M]r. Ramiro Colón also owes the institution a total of $153,073 for mortgage payments, **life insurance** and office furniture.... Mr. Colón is under the impression that when he signed the Order with the OTS, it resolved all outstanding debts owed to the

**continúa…**

[36] …**continuación**

institution and [he] has no intention of making any additional payments to [the Bank]". Apéndice, pág. 106–107. "This amount represents $83,113 in mortgage payments (includes accrued interest), **$66,[5]75 in life insurance premiums** and $3,285 for office furniture purchased". *Id.,* pág. 108. (Énfasis suplido.)

Según surge del informe, el examinador Bouchard dio notificación sobre este pormenor a la división de ejecución y litigio de la OTS ("Enforcement Division of the OTS"). Pese a sus hallazgos, y para su sorpresa, la respuesta de dicha división fue la siguiente: "that these items were not part of the settlement agreement with Mr. Colón". *Id.,* pág. 107. Ello explica el por qué la OTS, en el ejercicio de la discreción que le concede la sección 8 de FISA, nunca ha procurado exigir la devolución de estas partidas en la Corte de Distrito Federal.

No obstante, el examinador Bouchard sostuvo un criterio distinto, y así lo indicó en su informe; concluyó que "the institution should pursue **all legal remedies available** to obtain reimbursement on these items". *Id.* (Énfasis suplido.) De ahí la presente acción incoada por el Banco en contra del recurrido en el TPI.

[37] A más de esto, como indicamos anteriormente, el Banco no fue parte en el acuerdo de transacción. Y si bien podría argumentarse que el sexto inciso de dicho acuerdo constituye una estipulación a favor de tercero —o sea, a favor del Banco— no obstante, estamos impedidos de examinar dicho planteamiento ya que, como aclaramos hoy, para ello simplemente carecemos de jurisdicción.

para asumir jurisdicción donde la ley no la confiere. *Maldonado v. Pichardo*, 104 D.P.R. 778, 782 (1976).[38]

En fin, los tribunales de Puerto Rico carecen de jurisdicción para **"hacer cumplir" o "ejecutar" ("enforce") el acuerdo de transacción** convenido entre el recurrido y la OTS. Dicho de otro modo, el estatuto federal impide que los tribunales de Puerto Rico, o cualquier otro tribunal estatal dentro de E.U.A., **adjudiquen, interpreten, o ejecuten** las órdenes por consentimiento dictadas por la OTS o cualquier otra agencia federal reglamentadora de la industria financiera, que se haya dictado al amparo de la sección 8(b) de FISA.

En el caso de autos, es forzoso concluir que tanto el TCA como el TPI erraron al interpretar, adjudicar y resolver los derechos de las partes involucradas en el caso de autos **a base del contenido del acuerdo de transacción** establecido entre el recurrido y la OTS. Somos del criterio que los tribunales actuaron a base de una premisa errada, a saber, que poseían jurisdicción para exigir el cumplimiento específico del acuerdo conforme a la interpretación judicial que hiciesen sobre el término "rescinded" contenido en el mismo. Claramente, el acto de interpretar el acuerdo denota su percepción de que podían ejecutarlo. Es decir, que al interpretar el término "rescinded", y fallar en contra del Banco, dichos tribunales, en efecto, ejecutaron el acuerdo. No hay duda de que, para ello, simplemente carecían de autoridad en ley.[39]

El hecho de que las partes no hayan alegado ni planteado la cuestión sobre jurisdicción no es óbice para que hayamos entendido en dicho asunto. Conocida es la norma que impone a los Tribunales el deber y la ineludible obligación de examinar prioritariamente si poseen jurisdicción para

---

[38] Todo lo relativo a la adjudicación, interpretación y ejecución de las órdenes dictadas por la OTS o cualquier otra agencia federal reglamentadora de la industria financiera es asunto que compete exclusivamente a las cortes federales. Es decir, es un área que ha sido específicamente desplazada ("preempted") por la legislación federal. *Mortgage Market, Inc. v. Federal Deposit Ins. Corp. for Bankers Trust*, 780 F.Supp. 406 (1991) (E.D. La., 1991).

[39] Habiendo resuelto que carecemos de jurisdicción para adjudicar el presente caso a base del acuerdo de transacción, es obvio que tampoco es

adjudicar un caso ante sí. *Pagán v. Alcalde Mun. de Cataño*, 143 D.P.R. 314 (1997); *Soc. de Gananciales v. A.F.F.*, 108 D.P.R. 644, 645 (1979).

Conforme a este precepto nos corresponde siempre ser los guardianes de nuestra jurisdicción, independientemente de que la cuestión no se nos haya planteado anteriormente.

---

procedente entrar a dilucidar e interpretar el término "rescinded" contenido en el mismo.

*Vázquez v. A.R.P.E.*, 128 D.P.R. 513 (1991); *Gobernador de P.R. v. Alcalde de Juncos*, 121 D.P.R. 522 (1988); *López Rivera v. A.F.F.*, 89 D.P.R. 414 (1963). Es decir, que si las partes no lo han planteado, los tribunales no están impedidos de resolverlo *motu proprio*. *Id.*, pág. 419. Cabe señalar finalmente que en el caso particular de los foros apelativos, nos corresponde examinar no solamente si tenemos jurisdicción para resolver la controversia sometida, sino también si los tribunales inferiores tenían jurisdicción sobre la materia. *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986); *Juidice v. Vail*, 430 U.S. 327 (1977); *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934).

V

En conclusión, resulta totalmente improcedente que, en el caso de autos, el Banco intente recobrar la suma de $66,575 ya que para ello los tribunales locales simplemente carecen de jurisdicción. Aclaramos, no obstante, que si bien es cierto que los tribunales no tienen jurisdicción para ejecutar o modificar una orden de la OTS, ello no impide que una parte que invoque una causa de acción amparándose en el ordenamiento jurídico de Puerto Rico pueda acudir a dichos foros, siempre que con ello no se ejecute, modifique o afecte la orden de la OTS.

Se revoca la sentencia del Tribunal de Circuito de Apelaciones de 7 de mayo de 1999 y la dictada por el Tribunal de Primera Instancia de 20 de marzo de 1996, y se desestima la presente acción por falta de jurisdicción.

Se dictará sentencia de conformidad con lo aquí dispuesto.


BALTASAR CORRADA DEL RIO
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ponce Federal Bank, F.S.B.
(ahora Banco Bilbao Vizcaya)

     Peticionario

        v.

Chubb Life Insurance Company
of America; Ramiro L. Colón,       CC-1999-441
Jr., Georgina Ortiz Dexter y
la Sociedad de Gananciales
entre ellos constituida; John
Doe and Jane Doe
Beneficiarios Desconocidos

     Recurridos

SENTENCIA

San Juan, Puerto Rico, a 18 de octubre de 2001.

     Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la sentencia del Tribunal de Circuito de Apelaciones de 7 de mayo de 1999 y la dictada por el Tribunal de primera Instancia de 20 de marzo de 1996, y se desestima la presente acción por falta de jurisdicción.

     Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López no interviene. El Juez Presidente señor Andréu García y el Juez Asociado señor Fuster Berlingeri no intervinieron.


               Isabel Llompart Zeno
           Secretaria del Tribunal Supremo